Francis H. DONOVAN

v.

DIGITAL EQUIPMENT CORP.

Civ. No. 93–97–JD.

United States District Court,
D. New Hampshire.

Dec. 13, 1994.

Francis G. Murphy, Jr., Nixon, Hall & Hess, Manchester, NH, for Francis H. Donovan.

David C. Casey, Peckman, Lobel, Casey, Prince & Tye, Boston, MA, Steven M. Gordon, Shaheen, Cappiello, Stein & Gordon, Concord, NH, for Digital Equipment Corp.

## ORDER

DiCLERICO, Chief Judge.

The plaintiff, Francis Donovan, brings this action against defendant Digital Equipment Corporation ("Digital") to recover losses related to the termination of his employment with Windsor Communications International ("Windsor"). The plaintiff alleges that Digital is liable under federal antitrust law, state antitrust law, state consumer protection law and common law tort. The court's jurisdiction is based on federal question as provided by 28 U.S.C.A. § 1331 (West 1993) and diversity of citizenship as provided by 28 U.S.C.A. § 1332 (West 1993).

Before the court is Digital's motion for summary judgment on all four claims (document no. 13).

### Background

The parties have stipulated to an agreed statement of facts for purposes of this mo-

tion. Facts to Which Parties Have Stipulated ("Statement").

The plaintiff worked for Digital as a public relations manager for eleven years. Statement at ¶ 3. In spring 1992, the plaintiff accepted an early retirement package from the defendant and, in so doing, signed a retirement contract ("agreement"). *Id.* at 4. In exchange for a lump-sum payment and other benefits, the plaintiff agreed to certain limitations related to his ability to work for a competitor of the defendant. *Id.* at ¶¶ 2, 14–15. The relevant language provides:

14. Employee agrees not to become employed by, consult for, or in a any way provide employee, consultant or contract worker services for, or on behalf of, any ... competitor of Digital before 1 December 1992. The restriction on Employee in the foregoing sentence shall apply only to services performed within the United States of America and only to services substantially similar to services he or she performed for or on behalf of Digital while an employee of Digital. Employee acknowledges that the restrictions set forth in this Paragraph 14 are reasonable in both geographical and temporal scope, as well as in all other respects.

15. Employee specifically acknowledges an obligation to protect Digital's proprietary rights and confidentiality as provided for in Digital's Employee Agreement and policies.

Agreement at ¶¶ 14, 15. The agreement also states:

13. This document includes all of the agreements of the parties relative to Employee's termination, and supersedes any prior agreements or representations between the parties as to subjects covered. Employee specifically agrees that nothing in this Agreement modifies Employee's obligations and responsibilities under any prior Employee Agreement ... previously executed by Employee, including without limitation, any non-competition, protection of confidential information of Digital or

others, and employee obligation clauses except as specifically referred to herein.

*Id.* at ¶ 13. Digital maintains a set of purchasing policies and procedures ("purchasing policy"). *See* Statement at ¶ 20. Purchasing policy section 2.01 provides in relevant part:

No contract will be awarded to Digital employees or to members of their immediate families. ... This policy applies to all Digital employees and continues in force for one year after an employee leaves Digital's employment.

*If the hiring of a former Digital employee by a supplier would give that supplier a competitive advantage over other firms, Purchasing may invoke a prohibition as regards the former employee dealing with Digital in a sales, sales engineering or marketing capacity for one year.

*Individual exceptions to the foregoing restrictions on business dealings with employees and former employees must be approved by the business or operational Vice President responsible for the organization seeking the exception, or by the Corporate Purchasing Vice President.

Purchasing Policy at § 2.01.

After leaving Digital, the plaintiff immediately began work as director of public relations for Windsor, a vendor to Digital. Statement at ¶¶ 6–9.[1] The bulk of Windsor's revenues came from performing public relations projects for Digital and, according to Windsor's written offer of employment ("offer"), one of the plaintiff's responsibilities would be the "[i]dentification of PR opportunities within Digital...." *Id.* at ¶ 9; Offer at 1. Prior to his final day at Digital the plaintiff discussed his intention to join Windsor with Digital's director of public relations and other public relations managers. Statement at ¶ 6. The plaintiff "asked for their support, which he received." *Id.* at ¶ 7.

Quantic Communications ("Quantic") competed with Windsor for Digital contracts. Statement at ¶ 11. Quantic was founded by former Digital employees in 1991 with the

---

1. According to the written offer of employment, the plaintiff would be paid an hourly salary as a consultant for the first three months of service as director of public relations. Offer at 1. Follow-ing that time the plaintiff would be appointed vice president of public relations upon mutual agreement of terms. *Id.*

support of Digital, which wanted to subcontract out much of its marketing and communications work. *Id.* at ¶ 12. Digital provided extensive financing to Quantic and executed a contract to purchase approximately thirty million dollars in services from the company during the following three years. *Id.* at ¶ 13. Digital also guaranteed a three year, $2.4 million bank loan on Quantic's behalf. *Id.* at ¶ 14.

In late July 1992, Digital received a requisition for a $7,900 public relations project to be performed by Donovan at Windsor. Statement at ¶ 19. The purchasing department rejected the requisition on the grounds that Donovan was barred from working on Digital projects under section 2.01 of the purchasing policy. *Id.* at ¶ 20.

Digital informed Windsor that it could seek an exception to the purchasing policy which, if granted, would allow the plaintiff to work on Digital projects as a Windsor employee. Statement at ¶ 24. Digital had granted exceptions to the policy in the past. *Id.* at ¶ 27. However, Windsor elected not to seek the exception and instead decided to preserve its relationship with Digital by terminating the plaintiff. *Id.* at ¶¶ 22, 26. Aside from his inability to work on Digital projects, Windsor management was satisfied with the plaintiff's work performance during his two months of employment, June and July 1992. *Id.* at ¶ 18.

The plaintiff himself contacted Digital personnel to inform them that he was terminated because of the purchasing policy. Statement at ¶ 23. The plaintiff unsuccessfully sought an exception to the purchasing policy on his own behalf. *Id.* at ¶ 25.

### Discussion

The plaintiff asserts that the defendant's conduct relative to the purchasing policy violates the Sherman Antitrust Act, 15 U.S.C. § 1, and the New Hampshire antitrust act, N.H.Rev.Stat.Ann. ("RSA") § 356 *et seq.*, in that the defendant combined with Quantic and/or with Windsor to allocate or divide markets to the plaintiff's detriment. Complaint at ¶¶ 48–55. The plaintiff further asserts that the defendant's use of the purchasing policy to bar him from working on Digital

projects violated the New Hampshire Consumer Protection Act, RSA § 358–A *et seq.* *Id.* at ¶ 44. The plaintiff further asserts that the defendant's conduct constitutes a tortious interference with his contractual relationship with Windsor. *Id.* at ¶¶ 38–40.

In its motion for summary judgment defendant asserts that the plaintiff lacks standing to maintain the antitrust claims and, in the alternative, has failed to state a cognizable antitrust claim upon which relief may be granted. Defendant's Motion for Summary Judgment ("Motion") at 1. The defendant further asserts that the plaintiff cannot proceed with a claim under the consumer protection act because disputes arising out of an employment relationship are beyond the scope of the act. Defendant's Memorandum in Support of Motion for Summary Judgment ("Memorandum in Support of Motion") at 15. The defendant also argues that the plaintiff cannot proceed with a common law tort claim because he has failed to demonstrate that Digital improperly interfered with his relationship with a third party. Motion at 1.

 The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Snow v. Harnischfeger Corp.,* 12 F.3d 1154, 1157 (1st Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994) (quoting *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Quintero de Quintero v. Aponte–Roque,* 974 F.2d 226, 227–28 (1st Cir.1992). The court must view the entire record in the light most

favorable to the plaintiff, " 'indulging all reasonable inferences in that party's favor.' " *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991) (quoting *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)).

### I. Federal Antitrust Claim

The Plaintiff claims the defendant violated the Sherman Act by combining with Quantic and/or with Windsor for the "purpose and effect of allocating or dividing customers or markets in part of DEC's trade or commerce." Complaint at ¶ 52. In its motion the defendant argues that it is entitled to summary judgment because the plaintiff lacks standing to advance the antitrust claim and, in the alternative, has failed to state a cognizable claim under the statute. Motion at 1.

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1 (West Supp.1994). Section 4 of the Clayton Act provides a private right of action for a substantive violation of a federal antitrust law. 15 U.S.C.A. § 15 (West Supp.1994).[2]

The Supreme Court has adopted the requirement of antitrust standing to limit the class of persons entitled to advance a claim under § 4. *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535, n. 31, 103 S.Ct. 897, 907, n. 31, 74 L.Ed.2d 723 (1983). The requirements of standing to maintain a private federal antitrust claim exceed those of standing in the traditional constitutional sense. *Sullivan v. Tagliabue*, 25 F.3d 43, 45–46, n. 5 (1st Cir.1994) (citing *Associated Gen. Contractors*, 459 U.S. at 535, n. 31, 103 S.Ct. at 907, n. 31). Courts consider six factors to determine whether a plaintiff has "antitrust standing."

1) The causal connection between the alleged antitrust violation and harm to the plaintiff;

2) an improper motive behind the defendant's conduct;

3) the nature of the plaintiff's alleged injury—was it an "antitrust injury" (the type Congress sought to redress with the antitrust laws);

4) the directness with which the alleged market restraint caused the asserted injury;

5) the speculative nature of the damages; and

6) the risk of duplicative recovery or complex apportionment of damages.

*Sullivan*, 25 F.3d at 46; *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406–07 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992).

The Supreme Court has not indicated how the factors should be applied or whether the failure to satisfy a given factor would alone defeat an antitrust claim. *Sullivan*, 25 F.3d at 46. The court of appeals has recently held that the court is required to consider all the factors "in an effort to guard against engrafting artificial limitations on the § 4 remedy." *Id.* (quotations omitted). However, the "existence of antitrust injury is a central factor in the standing calculus." *Id.* Although "the absence of antitrust injury weighs heavily against a grant of standing," the court stopped short of ruling that a plaintiff must demonstrate such an injury to proceed. *Id.* at n. 9.

---

2. Because the Sherman Act does not provide a private right of action, the court treats the plaintiff's Sherman Act claim as a claim under the Clayton Act. Section 4 provides in relevant part: [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C.A. § 15(a).

An antitrust injury is an injury of the type "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)), *on remand*, 972 F.2d 1070 (9th Cir.1992), *withdrawn and substituted on reh'g*, 13 F.3d 1276 (9th Cir.1994); *Sullivan*, 25 F.3d at 48; *David Wheeler v. Mobil Chemical Company, Inc.*, C–94–228–B, slip op. at 5–6, 1994 WL 730404 (D.N.H. November 17, 1994). "The antitrust laws ... were enacted for the protection of *competition* not *competitors.*" *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. at 697 (emphasis in original) (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)); *see Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107–11, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986); *Adams*, 828 F.2d at 26 ("only harm stemming from a reduction in competition qualifies as an injury cognizable under the antitrust laws"). Likewise, it is "inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atlantic Richfield Co.*, 495 U.S. at 334, 110 S.Ct. at 1889 (quotations and citations omitted). Finally, harm to a plaintiff's business alone does not establish injury to competition in a relevant market. *Wheeler*, slip op. at 4–5 (plaintiff must show a "reduction of competition in the market in general and not mere injury to [his] own position as competitor in the market") (quoting *Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989)).

By its nature, "an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). However, because not "every person tangentially affected by an antitrust violation" is entitled to maintain a claim under the Clayton Act, courts examine the causal connection between the alleged violation and harm and also the directness with which the alleged market restraint caused the asserted injury. *McCready*, 457 U.S. at 477, 102 S.Ct. at 2547. In general, employees do not have standing to sue under the Clayton Act because "they lack competitive and direct injury." *Air Courier Conf. of America v. American Postal Workers Union*, 498 U.S. 517, n. 5, 111 S.Ct. 913, n. 5, 112 L.Ed.2d 1125 (1991) (citing *Adams v. Pan American World Airways, Inc.*, 828 F.2d 24 (D.C.Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988)). In *Sharp*, the former employees of a bankrupt airline lacked standing to maintain an antitrust action against the defendant for using monopoly power to drive the airline out of business.

> [S]alaried employees ... are not within the area of competitive economy protected against [antitrust violations] ... we perceive no limitation in the clear and well-reasoned basis for the broad principle ... that employees simply cannot establish an antitrust injury as a result of some allegedly anticompetitive activity directed at or involving their employer.

967 F.2d at 408 (quotations and citations omitted); *see Adams*, 828 F.2d at 27–30; *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 541–42 (9th Cir.1987). Moreover, in cases where a plaintiff's antitrust injury is indirect or derivative of an employment relationship, he may be denied standing even if not an "employee" in the rigid sense of the term. *See Eagle*, 812 F.2d at 541 (commissioned employees denied standing); *see also Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*, 830 F.2d 1374, 1378 (7th Cir.1987) (no standing for "derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company") (citing *Associated Gen. Contractors*, 459 U.S. at 533–36, 541 n. 46, 103 S.Ct. at 906–07, 910 n. 46).

The specific intent behind an antitrust defendant's conduct is relevant in that an allegation of improper motive can support a claim for damages under § 4. *Associated Gen. Contractors*, 459 U.S. at 536–38, 103 S.Ct. at 908. However, the availability of a private antitrust remedy is "not a question of the specific intent of the conspirators." *Id.*

(quoting *McCready,* 457 U.S. at 479, 102 S.Ct. at 2548); *see Sullivan,* 25 F.3d at 47, n. 7. Thus, a plaintiff is not entitled to antitrust standing merely because he has alleged an improper motive. *Sullivan,* 25 F.3d at 47, n. 7.

█ Finally, courts consider whether the plaintiff's damages are speculative in nature and whether a finding of liability will involve a risk of duplicative recovery or a complex apportionment of damages. The Supreme Court disfavors antitrust lawsuits in which plaintiffs can only prove damages through "long and complicated proceedings involving massive evidence and complicated theories." *Associated Gen. Contractors,* 459 U.S. at 544, 103 S.Ct. at 911 (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)); *see McCready,* 457 U.S. at 475–76, n. 11, 102 S.Ct. at 2547, n. 11 (considering whether "claim rests at bottom on some abstract conception or speculative measure of harm") (citations omitted). Damages may be considered speculative where the plaintiff's injury was indirect and possibly the result of intervening factors unrelated to the defendant's conduct. *Associated Gen. Contractors,* 459 U.S. at 540–42, 103 S.Ct. at 910.

The court's application of the standing factors is constrained by deficiencies in the plaintiff's complaint and legal memorandum. The plaintiff has not clearly and consistently identified a relevant market, instead relying on conclusory assertions of suppressed competition within an unspecified market.[3] Moreover, the court cannot even determine the theory of the plaintiff's antitrust claim as his allegations are inconsistent and appear self-contradictory. He argues that Quantic and Digital unlawfully combined to harm their competitor, Windsor. Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Memorandum in Opposition to Motion") at 33, 38; *compare* Complaint at ¶ 28 ("Windsor is not a DEC competitor but, rather, a vendor"). The plaintiff also appears to argue that *he* was the market participant injured by Digital's conduct. *Id.* at 31. And, in yet another variation on a confused theme, the plaintiff alleges that he was competing with both Windsor and Digital. *Id.* at 35.

Although the theory of antitrust violation is poorly articulated, the plaintiff is explicit on the nature of his harm:

> In this case, Francis Donovan suffered the *very injury the antitrust laws were designed to prevent:* he was driven out of his consultant position, and he lost the ability to achieve an equity position at Windsor. In addition, the effect of this injury was to lessen competition in the Southern New Hampshire marketing business so as to enhance the defendant's admitted efforts to "support Quantic."

Memorandum in Opposition to Motion at 33 (emphasis supplied).

█ The inability to work on Digital projects for a Digital vendor for one year, either independently or as a Windsor consultant, is at most an injury to the plaintiff's personal business interest.[4] The antitrust laws were designed to protect competition, not individual employment opportunities and, as such, this not a cognizable antitrust injury. Indeed, even if the plaintiff is considered a market participant, as opposed to the former employee/consultant of one (Windsor), he has failed to advance facts to support the conclusory allegations of suppressed competition. The court concludes that the plaintiff has not suffered an antitrust injury because he will be unable as a matter of law to demonstrate that the defendant's conduct suppressed

3. The plaintiff attempts to re-state his antitrust claim with specificity in his reply brief. He identifies the relevant market as the "marketing/communications area in Southern New Hampshire" (Plaintiff's Memorandum at 1–2), and as the "Southern New Hampshire marketing business" (*Id.* at 33). The court cannot properly assess the antitrust claim with such a skeletal description of a market.

4. The court notes that Digital purports to have adopted the purchasing policy to maintain the integrity of its procurement process by preventing former employees from having an unfair advantage when competing for Digital contracts. To the extent the application of the policy serves its purpose, the defendant's conduct *promotes* competition and, thus, the plaintiff's claim is "inimical to the antitrust laws." *See Atlantic Richfield Co.,* 495 U.S. at 334, 110 S.Ct. at 1889.

competition in a relevant market. This conclusion strongly disfavors standing.

The plaintiff's claim is further impeded by the application of other factors to the antitrust standing calculus. The plaintiff's injury is neither causally related to, nor the direct result of, the defendant's alleged market restraint. First, the plaintiff's job loss is directly attributable to Windsor, which made a business decision to fire him rather than seek an exemption or re-assign him to work on non-Digital projects. The plaintiff had retired from Digital and, thus, Digital had no direct control over his subsequent relationship with Windsor.

Second, even if Digital did violate the Sherman Act by rejecting requisitions from Windsor, the plaintiff's injury is derived from his employment relationship with Windsor, the direct antitrust victim.[5] The plaintiff even concedes that Windsor was the target of the alleged market restraint insofar as Digital's "motive in interfering with [the plaintiff's] relationship with Windsor was to protect its special relationship with Quantic." Memorandum in Opposition to Motion at 2, 33. The court finds that any injury suffered by the plaintiff was a "ripple of harm" incidental to the defendant's conduct against Windsor. See McCready, 457 U.S. at 476–77, 102 S.Ct. at 2547. These conclusions disfavor standing.

The plaintiff has alleged that the defendant's conduct was motivated by an improper purpose, namely, to benefit Quantic. Plaintiff has supported this assertion with facts revealing the contractual relationship between Digital and Quantic. The court finds that the plaintiff has adequately alleged an improper motive and this conclusion favors antitrust standing.[6]

Finally, the plaintiff argues that his antitrust claim neither involves speculative damages nor the risk of duplicative recovery.

The plaintiff asserts that he is entitled to damages for lost earnings. Although it is not difficult to calculate back wages if the cause of termination is clear, the court notes that Windsor may have fired the plaintiff for reasons independent of Digital's purchasing policy. The matter is further complicated by the plaintiff's claim that the purchasing policy, while technically limiting employment for only one year, resulted in the loss of employment opportunities for a greater period of time. The court finds that the calculation of the plaintiff's damages would likely involve abstraction or speculation. This conclusion disfavors standing.

The risk of duplicative recovery is less of a concern considering that, based on the record, this is the only antitrust lawsuit involving the defendant's application of the purchasing policy. The court finds that in the absence of an action by a party claiming a more direct antitrust injury (i.e. Windsor) there is little risk of duplicative recovery. This conclusion favors standing.

This case, like most, includes "some factors tending in favor of standing ... and some against." Los Angeles Mem. Coliseum v. NFL, 791 F.2d 1356, 1363 (9th Cir.1986), cert. denied, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987). The plaintiff has not alleged a cognizable antitrust injury, a central factor in the standing analysis. Moreover, any harm suffered by the plaintiff was not the direct result of the defendant's conduct. The two damages factors essentially cancel each other out as one favors standing and the other disfavors it. The only remaining factor which favors standing is improper motive. Collectively, the factors weigh heavily against standing and the plaintiff may not proceed to a jury "merely by dressing [claims] up in the language of antitrust." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821

---

**5.** The plaintiff alleges that he was injured by his inability to continue to work as a consultant for and eventually achieve an equity position with Windsor. This is an employment relationship for purposes of considering the directness of injury and causal connection factors. Thus, the apparent dispute over whether the plaintiff was technically an "employee" or "consultant" neither impedes the court's antitrust standing inquiry nor

creates a genuine dispute of material fact that would defeat the motion for summary judgment.

**6.** In arriving at this conclusion the court does not determine whether, if true, Digital's use of the purchasing policy to benefit Quantic would constitute a violation of the antitrust laws.

(1985). The court grants summary judgment for the defendant with respect to the federal antitrust claim.

## II. State Antitrust Claim

The plaintiff also demands relief under the state antitrust act, RSA § 356 *et seq.* The plaintiff claims the state statute offers a broader private right of action than its federal counterpart because the two laws employ slightly different statutory language and because of New Hampshire's long tradition of "the protection of the individual." Memorandum in Opposition to Motion at 24 (citing the State Constitution and debate at the Constitutional Convention of 1902).

In its motion the defendant argues that the court should look to federal case law when interpreting the state statute. Memorandum in Support of Motion at 5. Under this theory, the defendant argues that it is entitled to summary judgment on the state claim for the same reasons it advanced in support of its motion on the federal claim. *Id.*

■ Section 2 of the state antitrust act, RSA § 356:2, is analogous to section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1. *Kenneth E. Curran, Inc. v. Auclair Transp., Inc.,* 128 N.H. 743, 748, 519 A.2d 280, 284 (1986) (per curiam).[7] The state act invites courts to interpret its provisions in accordance with federal law.

In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws.

RSA § 356:14 (1984); *see U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 599 (1st Cir.1993) ("state statute encourages a uniform construction"); *Wheeler,* slip op. at 2 (applying federal antitrust principles to state antitrust claim); *Auclair Transp.,* 128 N.H. at 748, 519 A.2d at 284 (same). However, the statutory language is permissive and, thus, the court is entitled to diverge from federal antitrust law when considering a state antitrust claim. *See* RSA § 356:14 ("the courts *may* be guided....") (emphasis supplied).

■ The plaintiff's state antitrust claim is predicated on the same operative facts and legal theories as the federal antitrust claim. The plaintiff argues that, despite the similarities between the federal and state statutes, New Hampshire's historic concern for the protection of the individual warrants a departure from established federal principles, such as the requirement of an antitrust injury to maintain a claim. *See* Memorandum in Opposition to Motion at 24–25. The argument, which is not supported by case authority, is not persuasive. Instead the court applies the federal antitrust standing requirements as this promotes the uniform construction of antitrust laws as contemplated by RSA § 356:14. The court grants the defendant's motion for summary judgment with respect to the state antitrust claim for the same reasons it granted the motion with respect to the federal antitrust claim.

## III. State Consumer Protection Claim

The plaintiff also seeks relief under the New Hampshire Consumer Protection Act, RSA § 358–A *et seq.* Complaint at ¶¶ 44–46. The plaintiff asserts that the defendant engaged in an unfair or deceptive trade practice by using an "unenforceable secret" purchasing policy to bar him from working on Digital projects on Windsor's behalf. Memorandum in Opposition to Motion at 16. The plaintiff also argues that the purchasing poli-

---

**7.** The state statute provides:

I. Every contract, combination, or conspiracy in restraint of trade is unlawful.

II. Every contract, combination, or conspiracy is unlawful which has the purpose or effect of:

(a) Fixing, controlling or maintaining prices, rates, quotations or fees in any part of trade or commerce; or

(b) Fixing, controlling, maintaining, limiting or discontinuing the production, manufacture, mining, sale or distribution of any commodity or service; or

(c) Allocating or dividing customers or markets in any part of trade or commerce; or

(d) Refusing to deal, or coercing, persuading or inducing any person to refuse to deal, with another person; or

(e) Fixing or controlling the price quotation of any bid for a public or private contract, submitting sham or complementary bids, or controlling the submission of bids including refusals to bid.

RSA § 356:2.

cy is invalid as it restricts his ability to earn a living. *Id.* at 10.[8]

Chapter 358–A is a " 'comprehensive statute designed to regulate business practices for consumer protection,' and its terms should be 'broadly applied.' " *Chroniak v. Golden Inv. Corp.*, 983 F.2d 1140, 1146 (1st Cir.1993) (quoting *Gilmore v. Bradgate Assocs., Inc.*, 135 N.H. 234, 238, 604 A.2d 555, 557 (1992)); *see Nault's Auto. Sales Inc. v. American Honda Motor Co.*, 148 F.R.D. 25, 47 (D.N.H.1993) (citations omitted); *Roberts v. General Motors Corp.*, 138 N.H. 532, 538–39, 643 A.2d 956, 960 (1994) (language of consumer protection statute "should be given broad sweep"). Section 2 of the Act provides:

It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practices in the conduct of any trade or commerce within the state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:

RSA § 358–A:2 (1984 & Supp.1993). The section also lists thirteen prohibited acts or practices. *See* RSA § 358–A:2. Although the list is considered nonexhaustive, the Act only prohibits "those types of [conduct] therein particularized." *Roberts*, 138 N.H. at 538, 643 A.2d at 960 (quotations omitted).

When construing the scope of the Act, the court "may be guided by the interpretation and construction given section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), by the Federal Trade Commission and the federal courts." RSA § 358–A:13. Moreover, the Act tracks the language of the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A, and New Hampshire courts have frequently relied on Massachusetts law when interpreting RSA § 358–A. *Chroniak*, 983 F.2d at 1146, n. 11 (citing *Chase v. Dorais*, 122 N.H. 600, 602, 448 A.2d 390, 391–92 (1982)); *see Roberts*, 138 N.H. at 538–39, 643 A.2d at 960 (expressly adopting statutory construction of

the Massachusetts Appeals Court); *see also McClary v. Erie Engine & Mfg. Co.*, slip op. at 3–4, 1994 WL 803088 (D.N.H. November 23, 1994) (expressly relying on decision of the Massachusetts Appeals Court).

The Massachusetts statute, although broadly construed, does not provide a private remedy for "disputes arising out of the employment relationship between an employer and an employee." *Evans v. Certified Eng'g. & Testing Co.*, 834 F.Supp. 488, 499 (D.Mass.1993) (quoting *Manning v. Zuckerman*, 388 Mass. 8, 14, 444 N.E.2d 1262, 1266 (1983)); *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 227–28 (D.Mass.1990) (Act "embraces marketplace transactions, not ... claim[s] against [an] employer for unfair and deceptive acts in connection with an agreement terminating [plaintiff's] employment"). Moreover, for purposes of determining the scope of ch. 93A, the court may consider a dispute between employers and independent consultants, former employees or contractors to have arisen out of an employment relationship. *See Bolen*, 754 F.Supp. at 227–28; *Manning*, 388 Mass. at 10–15, 444 N.E.2d 1262; *see also Putnam v. Adams Communication Corp.*, 1987 WL 13262 at 5–6 (D.Mass. 1987) (dispute arose out of employment relationship where parties to "consulting contract" were, despite use of the word "consultant," "not dealing as independent business persons").

The plaintiff claims that the defendant unlawfully applied either the purchasing policy or the early retirement agreement to his detriment. This conduct is inextricably linked to the plaintiff's eleven year employment with—and retirement from—Digital. The purchasing policy expressly limits the plaintiff's ability to work on Digital-related projects following his departure. The policy directly relates to the terms of employment and retirement therefrom and, thus, arises out of the employment relationship. Likewise, the retirement agreement, freely signed by the plaintiff for valuable consider-

---

**8.** [A]t issue in this case is the very essence of the inherent and fundamental constitutional right of Francis Donovan to seek and pursue his livelihood without the oppressive interference of a corporate giant that did actually destroy his business.

Plaintiff's Memorandum at 9.

ation, governs the terms of the plaintiff's retirement from Digital and, thus, also arises out of the employment relationship.[9]

The plaintiff argues in his reply brief that he is entitled to pursue the consumer protection claim because he was a consultant to and "not an employee of Windsor at the time of his termination." Memorandum in Opposition to Motion at 19. The argument is perplexing. The nature of the plaintiff's relationship with *Windsor* is irrelevant because he has not sued Windsor. Rather, the only consumer protection claim before the court alleges that the plaintiff was "injured by *DEC's* unlawful trade practices." Complaint at ¶ 45 (emphasis supplied).

The plaintiff's lengthy relationship with the defendant did not involve the genre of marketplace or consumer transactions actionable even under an expansive reading of the Act. Rather, this was, in form and essence, an employment relationship and, as a result, disputes arising from it may not be litigated under the New Hampshire consumer protection act.

## IV. Intentional Interference with Contractual Relations

The plaintiff also seeks relief under the common law tort of intentional interference with contractual relations. Complaint at ¶¶ 38–40. He asserts that the defendant's refusal to waive the purchasing policy forced Windsor to discharge him or risk losing most of its business. *Id.* at ¶¶ 28–31. The plaintiff further asserts that Digital officials "knew they were causing the plaintiff to be terminated by Windsor yet took no steps to prevent his ultimate termination." *Id.* at 32. The defendant requests summary judgment on the grounds that the plaintiff is unable to demonstrate that Digital improperly inter-

fered with his relationship with Windsor. Motion at 1.

### A. The Tort

New Hampshire recognizes the tort of interference with contractual relations as set out in the Restatement (Second) of Torts § 766 (1977). *Emery v. Merrimack Valley Wood Prods., Inc.*, 701 F.2d 985, 988 (1st Cir.1983) (citations omitted); *Alexander v. Fujitsu Business Communication Sys., Inc.*, 818 F.Supp. 462, 468–69 (D.N.H.1993); *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 46, 534 A.2d 706, 709 (1987).[10] To prove a tortious interference, a plaintiff must show:

(1) the plaintiff had an economic relationship with a third party;

(2) the defendant knew of this relationship;

(3) the defendant intentionally and improperly interfered with this relationship; and

(4) the plaintiff was damaged by such interference.

*Alexander*, 818 F.Supp. at 468–69; *see Emery*, 701 F.2d at 988. For purposes of the tort, a contract of employment is considered an economic relationship. *See* Restatement (Second) § 766 cmt. d.

The court considers whether the plaintiff has adequately plead the necessary elements of his tort claim. First, the parties agree that the plaintiff had negotiated an agreement with a third party (Windsor) and worked as either an employee or consultant under the agreement. An employment relationship of any stripe is considered an economic relationship even under the most narrow definition of the term.

Second, given the fact that prior to his retirement the plaintiff told Digital officials of his intentions to work for Windsor, it is

---

**9.** The parties disagree on whether the retirement agreement incorporates by reference or supersedes the purchasing policy. The court need not resolve the question. Because the existence or non-existence of a given limitation on post-retirement employment itself presents a dispute arising out of an employment relationship, an attempt to resolve the dispute is not cognizable as consumer protection claim.

**10.** According to the Restatement:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

clear that the defendant knew of the economic relationship with Windsor. Indeed, the defendant would not have had any reason to invoke the purchasing policy if it did not know the plaintiff was working for Windsor.

Third, the parties agree that the defendant's refusal to allow Windsor to perform Digital contracts led Windsor to terminate the plaintiff. The plaintiff has alleged that this application of the purchasing policy was improper insofar as it was an unreasonable restraint on his livelihood and was applied unevenly for the purpose of benefiting Quantic's business at the expense of Windsor's. He supports the allegation with specific facts relating to Digital's relationship with Quantic and the fact that other former Digital employees had successfully sought exemptions from the policy on their own behalf.[11]

Fourth, the parties agree that the plaintiff suffered financially from his inability to continue to work for Windsor pursuant to the employment agreement. The loss of employment constitutes an actionable damage or harm under the final element of the tort. Thus, the court finds that the plaintiff has properly stated his claim for relief under § 766 of the Restatement.

*B. The Affirmative Defense*

The Restatement also contains a complete defense to the tort available to defendants who interfere with contractual relations by "asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means ... if the [defendant] believes that his interest may otherwise be impaired or destroyed by the [relationship]." *Emery,* 701 F.2d at 988 (citing Restatement (Second) § 773). Under *Emery,* a defendant who successfully invokes the affirmative defense is found to have acted properly as a matter of law and, therefore, is entitled to summary judgment. 701 F.2d at 993. To satisfy § 773, the defendant must show:

(1) it had a legally protected interest;

(2) it acted in good faith to protect this interest; and

(3) it acted by appropriate means.

*Id.* at 988–89. In New Hampshire, courts uphold reasonable contracts which limit a former employee's ability to work if the restraint is "no greater than necessary for the protection of the employer's legitimate interest, does not impose undue hardship on the employee, and is not injurious to the public interest." *Emery,* 701 F.2d at 989 (quoting *Moore v. Dover Veterinary Hospital, Inc.,* 116 N.H. 680, 684, 367 A.2d 1044, 1047 (1976).

Employers have a legitimate interest in preventing former employees from using training and customer contacts to the employer's detriment. *Id.* at 989; *see Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 684, 406 A.2d 1310, 1313 (1979) (employer has legitimate interest in "protecting its business from former employees who have gained knowledge of its clients and internal operations....") (quotations omitted). Although New Hampshire courts do not favor covenants not to compete, they uphold restrictions when reasonable "as applied to the particular circumstances of each case." *Id.* (one-year restriction on former employee's ability to contact employer's recent customers considered "very narrow" restriction and reasonable) (citations omitted).

Finally, the defendant must establish that he acted in good faith in order to successfully invoke the affirmative defense. *Id.* at 992. The question of whether this element is satisfied necessarily involves issues of intent which are not well suited to resolution on a motion for summary judgment.

> State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind. But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply

---

11. In support of its motion, the defendant asserts that the plaintiff cannot prevail on this element of the tort claim because, as a matter of law, Digital has not "improperly" interfered with a third party relationship. Defendant's Memorandum at 11 (citing *Emery,* 701 F.2d at 989).

Rather than address the question of whether the defendant acted improperly here, the court follows the approach of the court of appeals in *Emery* and will address the defendant's argument in the context of the § 773 affirmative defense. *See* 701 F.2d at 988–89.

because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.

*Id.* (quotations and citations omitted). Despite its reticence to resolve a state of mind issue, the *Emery* court held that summary judgment was appropriate because it found that the defendants had a legally protected right to enforce the covenant and, as such, "no dishonorable motive may be inferred from [the defendant's] resolution to enforce this right." *Id.*

The court, applying the criteria outlined in the § 773 affirmative defense, next determines whether the defendant acted improperly by applying. A defendant whose conduct comports with § 773 has acted properly as a matter of law and, therefore, cannot be liable under the tort.

■■■ The defendant claims that it adopted and has enforced the purchasing policy to prevent former employees and their new employers from enjoying an unfair advantage when competing- for Digital contracts. This purpose is explicitly described and prominently incorporated into the text of the policy. *See* Purchasing Policy. The court finds that Digital, like any business, has a legally protected interest in maintaining the integrity of their procurement process and relationships with vendors. *See Emery,* 701 F.2d at 989; *Smith, Batchelder & Rugg,* 119 N.H. at 684, 406 A.2d at 1313.

■■■ The defendant also argues that its application of the purchasing policy is an appropriate means for purposes of the affirmative defense. The court agrees. The purchasing policy is tailored to the legitimate interest insofar as it prevents recently departed employees from taking unfair advantage of both their knowledge of Digital operations and their good will relationships with remaining employees. Indeed, one of the plaintiff's key responsibilities at Windsor was the "identification of PR opportunities within Digital Equipment Corporation." Offer at 1. The court also finds the terms of the purchasing policy to be reasonable in that they

only prohibited the plaintiff from working for a Digital supplier on Digital projects for a relatively brief period of one year. Moreover, the policy even included a procedure by which Windsor could apply for an exception. The court finds the purchasing policy to be a reasonable restriction and further finds that the policy is an appropriate means by which Digital may promote its legitimate business interests.

The final element of § 773, good faith conduct, presents a close question. The court has already found that the defendant has a legitimate interest in the integrity of the procurement process and that the purchasing policy is a reasonable and appropriate means to promote that interest. The court joins the court of appeals in *Emery* in reasoning that since Digital had "the legally protected right to enforce the [purchasing policy], no dishonorable motive may be inferred from [Digital's] resolution to enforce this right." 701 F.2d at 992.

However, the plaintiff appears to argue not only that the purchasing policy was unreasonable, but also that Digital's conduct was improper because it selectively enforced the policy. There is no dispute that in the past Digital had granted exceptions to the policy but it is unclear from the existing record under which circumstances the exceptions were granted. The defendant has not submitted authority for the proposition that Digital's legal right to enforce the policy means that it can, as a matter of law, enforce that right selectively or in any manner it chooses and still demonstrate that it acted in good faith.

■■■ In *Emery,* the plaintiff had done "nothing more than make conclusory allegations, unsupported by factual data, and thus ha[d] not demonstrated that [defendant's] motive ... presents a triable issue of fact." 701 F.2d at 992. The plaintiff here has done slightly better by showing that, for whatever reason, the policy was not evenly applied. The defendant has the burden of establishing each element of the affirmative defense and, for purposes of this motion, the plaintiff is accorded all reasonable inferences. Given the legal standard, the court cannot determine that, as a matter of law, the defendant

acted in good faith when it applied the purchasing policy. Thus, the plaintiff has provided "some indication that he can produce the requisite quantum of evidence ... to reach the jury" on the question of whether the defendant acted improperly. *See Emery*, 701 F.2d at 992. The court denies the motion for summary judgment with respect to the tort claim.

### *Conclusion*

For the foregoing reasons, the defendant's motion for summary judgment (document no. 13) is granted with respect to the plaintiff's federal antitrust claim, state antitrust claim and state consumer protection claim. The motion is denied with respect to the plaintiff's state tort claim for intentional interference with contractual relations.

SO ORDERED.