Lago & Sons Dairy v. H.P. Hood          CV-92-200-SD  06/20/95 P

UNITED STATES DISTRICT COURT FOR THE

                        DISTRICT OF NEW HAMPSHIRE


Lago & Sons Dairy, Inc.;
Michael Lago


     v.                                    Civil No. 92-200-SD


H.P. Hood, Inc.



                           O R D E R


     Before the court are a series of summary judgment motions

and a motion for reconsideration, all of which were filed by

defendant H.P. Hood, Inc.  Plaintiff Lago & Sons Dairy, Inc., has

interposed objections to each motion.



                          Background

     Defendant Hood is a manufacturer of dairy products.  Hood

sells its dairy products directly to certain retailers and

indirectly, through a distributor, to other retailers.

     This action arises out of the breakdown of a long-term

relationship between Hood and one of its distributors, plaintiff

Lago & Sons Dairy, Inc.

Lago began distributing Hood products in 1979 pursuant to a written wholesale distribution agreement, under which Lago delivered products to Hood's direct-buy customers--its "house accounts"--and received a case commission fee in return. Lago also purchased Hood products to sell to its own retail customers.

Lago continued to distribute Hood products under a written contract until February 1990, when Hood exercised its contractual right not to renew the written agreement then governing the parties' relations. Thereafter Lago and Hood continued to do business together under an oral agreement. However, Lago alleges that in March 1992 Hood breached that oral agreement by taking away its house account business from Lago.

At this point the already strained relationship between Hood and Lago completely broke down. The instant action, which includes claims by Lago and counterclaims by Hood based on the distribution relationship between the parties, followed.

<u>Discussion</u>

1. <u>Summary Judgment Standard</u>

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate if the evidence before the court shows "that there is

2

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The summary judgment process

> involves shifting burdens between the moving and the nonmoving parties.  Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'"  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). . . .

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994).

"Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995) (quoting Celotex Corp., supra, 477 U.S. at 322).  When the nonmoving party bears the burden of proof at trial and fails to make such a showing, "there can no longer be a genuine issue as to any material fact: the failure of proof as to

3

an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citing Celotex Corp., supra, 477 U.S. at 322-23), cert. denied, 131 L. Ed. 2d 850 (1995).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. Anderson, supra, 477 U.S. at 255; Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1159 (1st Cir. 1994)

## 2. Hood's Renewed Motion for Summary Judgment on Count V and Part of Count VIII

In Count V of its complaint, Lago alleges that Hood breached the parties' oral agreement that Lago would continue to distribute Hood products until May 17, 1993, when, on February 14, 1992, Hood notified Lago that it was terminating Lago's service of Hood's fluid group house accounts in six weeks. Complaint ¶¶ 61-62. In Count VIII, Lago alleges, in relevant part, that Hood's wrongful termination of Lago and willful breach of contract constituted an unfair trade practice in violation of

4

New Hampshire's Consumer Protection Act, New Hampshire Revised Statutes Annotated (RSA) 358-A.

Hood, in due course, moved for summary judgment on Count V on the ground that the alleged oral contract was unenforceable under New Hampshire's Statute of Frauds, RSA 506:2.[1] The court, in its order of September 6, 1994, determined that a genuine issue of material fact existed as to whether the doctrine of equitable estoppel prevented Hood from denying the enforceability of the oral contract and accordingly denied Hood's summary judgment motion. See Order of Sept. 6, 1994, at 18-21.

After additional discovery, Hood now renews its motion for summary judgment as to Count V on the ground that Lago is not entitled to invoke the doctrine of equitable estoppel because it cannot establish that it suffered the requisite injury.[2]

> The essential elements of equitable estoppel are:
> "(1) a representation or a concealment of material facts; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of

---

[1]RSA 506:2 "requires all agreements not to be performed within one year to be in writing and signed by the party to be charged." Phillips v. Verax Corp., 138 N.H. 240, 245, 637 A.2d 906, 910 (1994).

[2]To the extent that Count VIII is based on the conduct which forms the basis of Count V, defendant seeks summary judgment as to Count VIII on the same grounds.

5

the matter; (4) it must have been made
with the intention that the other party
should act upon it; and (5) the other
party must have been induced to act upon
it to [its] prejudice."

Hawthorne Trust v. Maine Sav. Bank, 136 N.H. 533, 538, 618 A.2d

828, 831 (1992) (quoting Nottingham v. Lee Homes, Inc., 118 N.H.

438, 442, 388 A.2d 940, 942 (1978)). See also Great Lakes

Aircraft Co. v. Claremont, 135 N.H. 270, 292, 608 A.2d 840, 854

(1992).[3]

It is well established that "[t]he application of

'[e]stoppel rests largely on the facts and circumstances of the

particular case.'" Great Lakes Aircraft, supra, 135 N.H. at 289,

608 A.2d at 852-53 (quoting Monadnock School Dist. v.

Fitzwilliam, 105 N.H. 487, 489, 203 A.2d 46, 48 (1964)).

Further, "[t]he party invoking estoppel has the burden of proving

that its application is warranted, and 'its existence is a

question of fact to be resolved by the trier of fact . . . .'"

Id., 135 N.H. at 289, 608 A.2d at 853 (quoting Olszak v. Peerless

Ins. Co., 119 N.H. 686, 690, 406 A.2d 711, 714 (1979)). See also

Concord v. Tompkins, 124 N.H. 463, 468, 471 A.2d 1152, 1154

---

[3]Since the only element challenged by defendant's motion is
that of injury, the court limits its discussion herein to said
element and assumes, consistent with its September 6, 1994,
order, that a genuine issue of material fact exists as to the
remaining elements of plaintiff's equitable estoppel claim.

6

(1984) ("Each element of estoppel requires a factual determination.").

"Since the function and purpose of the doctrine of estoppel are the prevention of fraud and injustice, there can be no estoppel where there is no loss, injury, damage, detriment, or prejudice to the party claiming it." 28 AM. JUR. 2D ESTOPPEL AND WAIVER § 78, at 715-16 (1966). Further, "the injury or prejudice involved must be actual and material or substantial and not merely technical or formal." Id. at 716.

Lago asserts that in early 1991 it purchased 17 trucks in reliance on Hood's assurances that the three-year oral contract between the parties was valid. Affidavit of Robert W. Lago ¶¶ 6-9 (attached to Lago's Objection as Exhibit B); Lago's Answer Interrogatory No. 11 of Hood's First Set of Interrogatories (attached to Defendant's Motion as Exhibit B). Lago spent approximately $600,000 to purchase the trucks in question. Lago Affidavit ¶ 9.

Hood now contends that Lago suffered no detriment from this truck purchase because (1) Lago's subsequent distribution agreement with Weeks/Crowley Dairy (Weeks) allowed Lago to meet its expenses as to thirteen of the trucks and (2) the remaining four trucks were sold, but at no loss to Lago. Hood further contends that even if Lago did incur a loss on the four trucks

7

that were sold, it cannot rely on that loss to show injury here because Hood offered to buy the trucks from Lago at book value.

### a. Lago's Agreement with Weeks

Hood allegedly breached its three-year oral distribution agreement with Lago on February 14, 1992, "by assuming the responsibility for delivery of dairy products to the house accounts then being delivered by Lago." Affidavit of Robert L. Lago ¶ 5 (Plaintiff's Exhibit C). Following Hood's termination of its oral agreement with Lago, Lago entered into an oral agreement with Weeks whereby Lago became a distributor of frozen and fluid Weeks products. Lago states that the distribution agreement with Weeks "was reached approximately one week prior to March 9, 1992 to commence on March 9, 1992." Lago's Supplemental Answers to Hood's Interrogatory No. 16 (Defendant's Exhibit C).

Hood asserts that Lago suffered no detriment as a result of its 1991 truck purchase because Lago's agreement with Weeks allowed Lago to meet its expenses as to thirteen of the seventeen trucks purchased.

Lago's agreement with Weeks is "a verbal agreement to purchase fluid, frozen or cultured products from Weeks with no specified time period and no restrictions to purchasing other competitive products." Lago's Supplemental Answer to Hood's

8

Interrogatory No. 4. Lago concedes that this agreement "gave Lago a number of benefits and savings, such as seven week credit terms, turning over $2.2 million in direct bill ice cream business to Lago, inventorying Weeks/Crowley products free of charge, and free freight from Concord to Portsmouth." Affidavit of Robert L. Lago[4] ¶ 15. Lago further concedes that, after losing Hood's house account business, it needed the Weeks contract to stay in business. Id. ¶¶ 14-15.

However, Lago maintains that they "projected that even with all the benefits and savings we realized from Weeks/Crowley we would still lose approximately $200,000 during the first year of our agreement with Weeks/Crowley. We believed that it was better to go forward with a bad year than to suffer a total financial loss." Id. ¶ 16. Lago further states that due to "the loss that we sustained in the first year of our agreement with Weeks/ Crowley of approximately $200,000.00, it is clear that we could not afford to carry the cost of the new trucks and costs associated with those trucks. The trucks cost us $14,729.00 per month from April 1992 through May 1993 for a total of $176,747.00 in damages." Id. ¶ 20.

---

[4]The court assumes that Robert "L." Lago and Robert "W." Lago (referred to elsewhere in this order) are the same person. Their signatures appear be the same, and the circumstances of their actions seem to indicate that they are the same person.

The court finds that the evidence before it creates a genuine issue of material fact as to whether Lago suffered any injury from its 1991 truck purchase.

### b.  Lago's Sale of Four Trucks

Sometime after March of 1992, Lago had to sell four of the seventeen trucks it had purchased in 1991.  Deposition of Robert W. Lago, Vol. I at 98-99, Vol. IV at 72-73 (Defendant's Exhibit F).  However, at his January 12, 1995, deposition, Robert W. Lago was unable to recall what the book values of the four trucks were at the time of their sale, what the sales prices were, or whether the sales resulted in a profit or loss to Lago.  Id., Vol. IV at 73.

The court finds that the evidence before it regarding the sale of the four trucks goes to the amount of damages suffered by Lago as a result of the oral distributor contract, but does not alter the court's previous finding that a genuine issue of material fact exists as to whether Lago suffered any injury from its 1991 truck purchase.

### c.  Waiver

Hood argues that even if Lago incurred a loss on its sale of the four trucks, "Lago now may not seek from Hood compensation

10

for that hypothetical loss since Lago declined Hood's March, 1992 offer to purchase the trucks at their book value and to assume the fleet <u>without any negative impact on Lago</u>."  Hood's Memorandum in Support of its Renewed Motion for Summary Judgment at 9.  Hood contends that Lago's voluntary relinquishment of Hood's offer constitutes a waiver and bars Lago's claim of damages with respect to the four trucks Lago had to sell.  In response, Lago argues, inter alia, that a genuine issue exists as to whether Hood's offer was valid.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1979).  Further, "[a]n '"offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain."'"  <u>Phillips</u>, <u>supra</u> note 1, 138 N.H. at 245, 637 A.2d at 910 (quoting <u>Chasan v. Village Dist. of Eastman</u>, 128 N.H. 807, 815, 523 A.2d 16, 21 (1986) (quoting RESTATEMENT OF CONTRACTS § 32 (1932))).  "Whether a given factual transaction is or is not an 'offer' is a question of *law* . . . ."  <u>Jay Edwards, Inc. v. Baker</u>, 130 N.H. 41, 45, 534 A.2d 706, 708 (1987).

11

Lago concedes in its answers to Hood's interrogatories that Hood expressed an interest in purchasing its trucks. Lago's Answer to Hood Interrogatory No. 18 (attached to Hood's Motion as Exhibit B). Lago further states that

> M[ark] Bigelow wanted a list of all trucks that we could have available. He said Hood could look into taking over Lago's payments. He wanted the year, VIN #, model, specifications, and all financial information from Natistrar, A.S.A.P., the next day if possible, or at least the number of trucks that will be available.

Id.

Mark Bigelow similarly states that after Hood canceled Lago's handling of the house accounts in 1992, he made "a phone call to Bobby . . . to ask him if he had any vehicles that were going to be available or he needed to get rid of that Hood could purchase . . . ." Deposition of Mark Bigelow, Vol. II at 60 (Defendant's Exhibit G).

Robert Lago, recalling his conversations with Bigelow about the trucks, testified at his deposition as follows:

> Q. . . . . My question to you is did Hood offer to purchase the trucks in February of 1992?
> A. As to the exact date, whether it was February or March, I'm not exactly sure, but I recall having a conversation with Mark Bigelow where Mark Bigelow had asked me if we had any trucks that we were planning on not using as a direct result of the loss of case fees.

12

Q.  And did he offer to purchase those trucks from you at that time?

A.  He may have offered to purchase them from me.

Q.  And what was your response to that offer?

A.  Well, there again, there was no specific number of trucks that he proposed to purchase.  I never told him that he could purchase a certain amount of vehicles from us.  I never gave him a figure that you could -- you may buy ten trucks, for example.  I never gave him that.

Q.  Did you ever offer in February or March of 1992 to sell any trucks to Hood?

A.  We had a couple conversations regarding the purchase of trucks.  I wasn't exactly sure what trucks, if any trucks, would be available for sale either to him or to whomever.

Q.  That doesn't quite answer my question.  Did you ever offer in February or March of 1992 to sell any trucks to Hood?

A.  No.

Q.  After March of 1992 did you ever offer to sell any trucks to Hood?

A.  No.

Deposition of Robert W. Lago, Vol. IV at 71-72 (Defendant's Exhibit F).

Representatives from Hood and Lago met on February 19, 1992, to discuss various issues, including Hood's purchase of Lago's trucks.  The agenda for that meeting states in relevant part,

2.) Truck Purchase
- Specifications on all vehicles need to be supplied by Lago.
- Hood will purchase all dairy vehicles that Lago does not require.
- Purchase price of vehicles will be negotiated on the basis of their book value.

13

Lago & Sons, Inc., Meeting Agenda, Feb. 19, 1992 (Defendant's Exhibit H) (emphasis added). Robert Lago's notes of that same meeting indicated that Bigelow "talked about truck purchases, the trucks available to him by Lago. Discussed possible buyback and lease at book value." Handwritten Notes of Robert Lago (Defendant's Exhibit H).

Robert Lago also states in his affidavit of April 10, 1995, that during the February 19 meeting "Mark Bigelow talked about 'possibly' buying back and leasing the Lago trucks at book value. There was never any discussion as to the actual price per truck and we never reached an agreement regarding how many trucks Hood was willing to purchase." Affidavit of Robert L. Lago ¶ 11.

The court finds, as a matter of law, that Hood's oral and written statements to Lago regarding the purchase of Lago's trucks do not constitute an offer because they do not contain certain material terms, including the quantity of trucks to be purchased and the purchase price. Instead, Hood's statements constitute preliminary negotiations towards an eventual offer by one of the parties to purchase or sell one or more trucks. See RESTATEMENT, supra, §§ 26, 33.

Given the absence of a definite offer from Hood, the court further finds that Lago could not have waived any rights associated with such an offer until the material terms of the

14

offer were made known to Lago.  See generally 28 AM. JUR. 2D
*Estoppel and Waiver* § 158 ("It must generally be shown by the
party claiming a waiver that the person against whom the waiver
is asserted had at the time knowledge, actual or constructive, of
the existence of his rights or of all the material facts upon
which they depended.").

#### d.  Damages

Defendant contends that even if Lago is able to demonstrate
that an exception to the Statute of Frauds applies in this case,
Lago cannot recover lost profits under the oral agreement, but is
instead limited to reliance damages.

The section of the Statute of Frauds invoked by Hood as an
affirmative defense to Lago's claim for breach of the oral
distribution agreement, RSA 506:2, renders unenforceable "'those
contracts which cannot be performed according to their terms
within a year from the time of their inception.'"  Phillips,
supra note 1, 138 N.H. at 246, 637 A.2d at 911 (quoting Davis v.
Grimes, 87 N.H. 133, 135, 175 A. 238, 240 (1934)).

Estoppel is generally "defined as 'a bar which precludes a
person from denying or asserting anything to the contrary of that
which has, in contemplation of law, been established as the truth
. . . by his own deed, acts, or representations, either express

15

or implied.'" Great Lakes Aircraft, supra, 135 N.H. at 289, 608 A.2d at 852 (quoting 28 AM. JUR. 2D *Estoppel and Waiver* § 1, at 600 (1966)). Here, if Lago can prove all of the essential elements of equitable estoppel, then the doctrine will operate to bar Hood's Statute of Frauds defense. E.g. Demirs v. Plexicraft, Inc., 781 F. Supp. 860, 863-64 (D.R.I. 1991); Hoffman v. Optima Sys., Inc., 683 F. Supp. 865, 869-70 (D. Mass. 1988). In so doing, the doctrine of equitable estoppel allows plaintiff to enforce the oral distribution contract and to seek damages from defendant for its breach thereof.

The application of the doctrine of equitable estoppel to bar a Statute of Frauds defense is consistent with section 139(1) of the RESTATEMENT (SECOND) OF CONTRACTS, which provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

RESTATEMENT (SECOND) OF CONTRACTS § 139(1) (1979).

The court finds that if plaintiff proves its equitable estoppel theory, it is not, as defendant contends, limited as a matter of law to recovering reliance damages, but is instead entitled to seek damages for breach of contract. However, due to

16

the equitable nature of an estoppel, such damages may be limited by the court as justice requires.

For the reasons set forth hereinabove, the court denies Hood's renewed motion for summary judgment on Count V and on part of Count VIII.


3. Hood's Motion for Partial Summary Judgment on Counts I and II of its Counterclaims

In Count I of its counterclaims, Hood asserts, inter alia, that Lago breached its contract with Hood by failing to pay certain invoices for dairy products Lago received in 1989. In Count II, Hood asserts that Lago has been unjustly enriched by its failure to pay for said dairy products.

The evidence submitted by Hood in support of its motion for partial summary judgment on Counts I and II of its counterclaims establishes that Lago failed to pay invoices totaling $210,436.43 between June 1989 and September 1989. See Affidavit of Frank J. Jamgochian ¶¶ 9-11; Hood's Account Summaries for Lago & Sons (attached to Jamgochian Affidavit as Exhibit A).

Lago admits that it did not pay certain invoices for dairy products received during the June 1989 through September 1989 time period. See Deposition of Paul Gallant at 59-60; Lago's March 1992 A/P Hood Report (attached to Gallant Deposition as

17

Exhibit 2).[5]  However, Lago contends that its failure to pay said invoices does not constitute a breach of contract because, at the time said invoices were due, Hood owed Lago $335,640 for credit not properly given to Lago for its delivery of dairy products to Hood's house account customers between 1985 and 1988.  Lago further asserts that Hood was obligated under the terms of the same contract to credit Lago's account for said amount, thereby obviating the need for Lago to pay the invoices in question.

In support thereof, Lago submits a copy of the written contract governing the parties' relationship during the time period in question.  Said contract states, in relevant part, that

> (1) Distributor shall sell and transfer to the Company all of the Products delivered to House Accounts.  Such sale and transfer shall be effected and title shall pass to the Company upon the delivery of the Products to the House Account and the signing by the House Account of a delivery ticket furnished by the Company showing the date, the items and quantities delivered.
> (2) Upon proper submission to the Company of the said signed delivery tickets, the Distributor will be issued a credit by Hood in the amount of the Distributor's purchase price for the Products delivered to said House Account.

--------

[5]Lago's March 1992 Accounts Payable Report shows that between June 1989 and September 1989 Lago did not pay Hood invoices totaling $215,358.84.

18

Wholesale Distributor Agreement § 8.B(1)-(2) (attached to Lago's Objection as Exhibit B).

Paul R. Gallant, Lago's accountant, was hired in early 1988 because Michael Lago believed Lago "was losing or missing income that should have been generated and received from the sale of dairy products." Affidavit of Paul R. Gallant ¶ 5 (attached to Lago's Objection). Gallant states that he "quickly discovered that Hood had not been giving proper credit to Lago for deliveries Lago made to the Hood House Accounts because Hood frequently failed to input into their computer the Lago delivery slip/invoices. For the customers who paid Hood in full, Hood often failed to give proper credit to Lago for deliveries made to those customers." Id. ¶ 8.

Lago and Hood subsequently undertook to investigate this purported credit problem. Gallant states,

> On August 9, 1989 at 9:30 a.m. I met with Frank Jamgochian to discuss the resolution of the outstanding credit owed to Lago. The meeting with Jamgochian, then the Director of Treasury Services at Hood, took place at the Hood plant in Charlestown, Massachusetts.
> During that meeting, Jamgochian presented me with the report entitled Lago Final Report and dated June 16, 1989. That report was the result of the research by Hood to determine the credit which Hood owed Lago from June 1985 through February 1988. This report entitled "Lago Final Report" which indicates "Lago correct $335,640.00" is attached herein as Exhibit A.

19

> During that meeting, Jamgochian told me
> that Hood did in fact owe Lago approximately
> $335,640.00 for credit which was not properly
> given to Lago for products Lago delivered to
> Hood's House Account customers.

Id. ¶¶ 12-14.

Gallant further states that Lago did not pay the invoices at issue here because of Hood's admission that it had failed to properly credit Lago's account in the amount of $335,640. Gallant Affidavit ¶¶ 16-18, 21.

In response to Lago's objection, Hood contends that Lago's defense fails as a matter of law because it is simply a reassertion of Lago's debt claim which was rejected by the court in its order of September 6, 1994.

Count VII of Lago's original complaint was a debt claim in which Lago asserted that Hood owed it between $500,000 and $700,000 as the result of the erroneous administration of accounts between the two parties from 1985 to 1988. In its September 6, 1994, order, this court granted Hood's motion for summary judgment on Count VII after finding that the debt claim asserted therein was barred by the three-year statute of limitations set forth in RSA 508:4, I. See Order of Sept. 6, 1994, at 28. The court further held that because Lago's debt claim was time-barred, Lago was not entitled to offset the amounts allegedly due to Lago under said claim against any

20

amounts determined to be due to Hood from Lago in the course of this action. <u>Id.</u>

It is Hood's position that these rulings preclude Lago from asserting what Hood characterizes as a "setoff" defense in response to Hood's breach of contract counterclaim. Hood maintains that said defense amounts to no more than a revival of Lago's time-barred debt claim and is itself time-barred for the same reasons.

New Hampshire has two statutory provisions which govern the availability of a set-off claim. The first statute, RSA 515:7 (1974), provides, "If there are mutual debts or demands between the plaintiff and defendant at the time of the commencement of the plaintiff's action, one debt or demand may be set off against the other." The second statute, RSA 515:8 (1974) provides, "No debt or demand shall be set off as aforesaid unless a right of action existed thereon at the beginning of the plaintiff's action."

Here, RSA 515:7 and 515:8 operate to preclude Lago from setting off the debt Lago sought to recover from Hood in Count VII against any debts or demands asserted by Hood because Lago's debt claim is time-barred and therefore "no right of action existed thereon at the beginning of [Lago's] action." RSA 515:8.

21

That being said, the court finds that the defense asserted by Lago is more akin to a recoupment than a set-off.

> Recoupment has traditionally been viewed as the right of a defendant to reduce or eliminate the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes upon him in the making or performance of that contract.

Zurback Steel Corp. v. Edgcomb, 120 N.H. 42, 44, 411 A.2d 153, 155 (1980) (citing 20 AM. JUR. 2D Counterclaim, Recoupment and Setoff § 1 (1965) [hereinafter 20 AM. JUR. 2D]). See also Varney v. General Enolam Co., 109 N.H. 514, 516, 257 A.2d 11, 13 (1969) ("Recoupment 'was originally a deduction from damages because of part payment, former recovery, or some analogous fact.'" (quoting James, CIVIL PROCEDURE § 10.14 (1965)).

The availability of recoupment does not depend on set-off statutes such as RSA 515:7 and 515:8. Stanley v. Clark, 159 F. Supp. 65, 66-67 (D.N.H. 1957); see also Varney, supra, 109 N.H. at 515, 257 A.2d at 12.

> This is because recoupment is in a sense not a separate cause of action, like set-off, but it is a defense to the plaintiff's cause of action, diminishing it because of some damage done to the defendant. This is especially true in contract cases, where the respective damages to both parties arise out of the same transaction and affect each party's legal rights and liabilities on the contract.

22

<u>Stanley</u>, <u>supra</u>, 159 F. Supp. at 67.

Under New Hampshire law, recoupment may be used "defensively to defeat or diminish plaintiff's recovery . . . [or] affirmatively to obtain full relief, a complete determination of all controversies arising out of matters alleged in the original petition, and to allow the defendant affirmative relief against the plaintiff." <u>Zurback Steel</u>, <u>supra</u>, 120 N.H. at 44, 411 A.2d at 155.

Where the plea of recoupment "seeks affirmative relief, rather than mitigation of the plaintiff's demand, it is subject to the operation of the statute of limitations." <u>Id.</u> (citing 51 AM. JUR. 2D, *Limitations of Actions* § 78 (1970) [hereinafter 51 AM. JUR. 2D]; W. W. Allen, Annotation, *Claim Barred by Limitation as Subject of Setoff, Counterclaim, Recoupment, Cross Bill, or Cross Action,* 1 A.L.R. 2d 630, 640, § 4 (1948) [hereinafter 1 A.L.R. 2d]). However, where the plea of recoupment is raised as a defense arising "out of the same transaction as the plaintiff's claim, [the defense] ordinarily survives as long as the cause of action upon the claim continues to exist." 51 AM. JUR. 2D § 77. "Stated in another way, the defense of recoupment may be asserted even though the claim as an independent cause of action is barred by limitations." <u>Id.</u>; <u>see also</u> 1 A.L.R.2d at 666, § 14 ("if a defendant's claim is in fact a recoupment the general statutes of

23

limitation do not defeat it; on the contrary it may be availed of defensively so long as plaintiff's cause of action exists").

A full and fair reading of Lago's objection to the motion sub judice reveals that Lago has invoked the right of recoupment as a defense to Hood's breach of contract counterclaim, and not as an avenue for obtaining affirmative relief. As a defense, it is well established that recoupment "may result only in the reduction of the plaintiff's claim, not in affirmative judgment for any excess over that claim." 20 AM. JUR. 2D § 12, at 236. Further, such a defense is not barred by RSA 508:4, I, the applicable statute of limitations.

In short, the court finds that Lago is entitled to assert a recoupment defense in response to Hood's breach of contract counterclaim. The availability of such a defense creates a genuine issue of material fact as to whether Lago's admitted failure to pay the invoices in question constitutes a breach of the contract between the parties. Assuming that Lago's failure to pay the invoices in question constitutes a breach of contract, Lago's recoupment defense creates a genuine issue of material fact as to the amount of damages suffered by Hood because of said breach.

The court further finds that the facts which form the basis of Lago's recoupment defense also preclude the court from

24

finding, as a matter of law, that Hood is entitled to recover under a theory of unjust enrichment. The court accordingly denies Hood's motion for partial summary judgment as to Counts I and II of its counterclaims.

## 4. Hood's Motion for Summary Judgment on Counts IX and X of Lago's Amended Complaint

In Counts IX and X of its amended complaint, Lago asserts that Hood violated sections 2(a) and 2(d) of the Clayton Antitrust Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a) and 13(d), by selling Hood products to its direct-buy retailers "at prices lower than those offered to Lago for Lago's resale to its retailers," Amended Complaint ¶ 82, and by providing its direct-buy retailers "with perks, such as free delivery and guaranteed product, not offered to Lago for Lago's resale to its retailers," id. ¶ 94.[6] Lago contends that as a

---

[6]Section 2(a) provides, in relevant part,

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who

25

result of Hood's discriminatory pricing and allowances practices, Lago's retail customers were unable to compete with Hood's direct-buy retail customers.  <u>Id.</u> ¶¶ 85, 96.  Lago further contends that Hood's discriminatory practices "substantially lessened competition and/or injured, destroyed, or prevented competition," <u>id.</u> ¶¶ 87, 98, and caused Lago to suffer "actual injury including a loss in sales and profits as a result of its retail customers['] inability to compete with the favored chain and retail stores," <u>id.</u> ¶¶ 88, 99.

---

> either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . . "

15 U.S.C. § 13(a) (1973).  Section (d) makes it unlawful

> for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any service or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d) (1973).

26

As a result of Hood's allegedly discriminatory conduct and the injury caused to Lago thereby, Lago seeks treble damages, expenses, and attorney's fees under § 4 of the Clayton Act, which provides in pertinent part, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . ." 15 U.S.C. § 15(a) (Supp. 1995).

Hood moves for summary judgment as to Counts IX and X on the ground that Lago does not have the antitrust standing necessary to bring a private action for treble damages under § 4 of the Clayton Act.

a. <u>Antitrust Standing Generally</u>

A literal reading of § 4 of the Clayton Act is admittedly "broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." <u>Associated Gen. Contractors, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 529 (1983). This lack of restrictive language "reflects Congress' 'expansive remedial purpose' in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them

27

of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." Blue Shield of Virginia v. McCready, 457 U.S. 465, 472 (1982) (quoting Pfizer, Inc. v. India, 434 U.S. 308, 313-14 (1978)).

Despite the broad language and remedial purpose of section 4, "the class of persons entitled to recover damages under Section 4 has been limited by caselaw through the doctrine of 'antitrust standing.'" Sullivan v. Tagliabue, 25 F.3d 43, 45 (1st Cir. 1994) (citing Associated Gen. Contractors, supra, 459 U.S. at 529-35; McCready, supra, 457 U.S. at 472-73). As recently explained by the First Circuit, the doctrine of antitrust standing involves the following concept: "even where a[n] [antitrust] violation exists and a plaintiff has been damaged by it,[7] the courts--for reasons of prudence--have sought to limit the right of private parties to sue for damages or injunctions." SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995).

---

[7]Hood concedes, for the purpose of the present motion only, that an antitrust violation has occurred and that Lago has been damaged by it. Hood's Reply Memorandum at 2. Accordingly, the court assumes that Hood's conduct, in selling its dairy products to its direct-buy retailers at lower prices than it sold those same products to Lago for resale to other retailers, may have lessened, injured, destroyed, or prevented competition for the sale of Hood dairy products at the retail level in violation of the Robinson-Patman Act. The court further assumes that Lago was damaged thereby.

Although "'the courts have never been able to create an intelligible theory of private antitrust standing capable of being applied across the full range of potential cases,'" id. (quoting H. Hovenkamp, Federal Antitrust Policy, 543 (1994)), the prudential concerns which courts have relied on to limit the rights of plaintiffs to bring antitrust actions have been delineated into a list of factors.  To determine whether a plaintiff has the requisite standing to bring a private action under § 4 of the Clayton Act, the court must evaluate each of the following factors:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

Sullivan, supra, 25 F.3d at 46 (citing Associated Gen. Contractors, supra, 459 U.S. at 537-45).

The court considers these factors in light of the First Circuit's recent interpretation of Associated General Contractors as requiring courts to evaluate the balance of these factors "in each case in an effort to guard against 'engraft[ing] artificial

29

limitations on the § 4 remedy.'" <u>Sullivan</u>, <u>supra</u>, 25 F.3d at 46 (quoting <u>McCready</u>, 457 U.S. at 472); <u>see also</u> <u>Donovan v. Digital Equip Corp.</u>, ___ F. Supp. ___, No. 93-97-JD, 1994 WL 790887, at *4 (D.N.H. Dec. 13, 1994).

<u>b. The Applicability of the Sullivan Factors to Lago's Treble Damages Claim</u>

Lago perceives there to be some injustice in requiring a plaintiff whose claims are based on the Robinson-Patman Act to prove a causal connection between the price discrimination complained of and the actual damages suffered by plaintiff in order to recover damages under § 4 of the Clayton Act when such proof is not required to make out a Robinson-Patman Act claim at trial. <u>See</u> Lago's Memorandum at 12-14. The court finds that the justification for imposing additional requirements on Robinson-Patman Act plaintiffs who seek treble damages was adequately explained by the Supreme Court in <u>J. Truett Payne Co. v. Chrysler Motors Corp.</u>, 451 U.S. 557, 561-62 (1981), as follows:

> By its terms § 2(a) [of the Robinson-Patman Act] is a prophylactic statute which is violated merely upon a showing that 'the effect of such discrimination <u>may be</u> substantially to lessen competition.' (Emphasis supplied.) . . . Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to '[a]ny person who <u>shall be injured</u> in his

30

business or property by reason of anything
forbidden in the antitrust laws . . . .'
(Emphasis supplied.)  To recover treble
damages, then, a plaintiff must make some
showing of actual injury attributable to
something the antitrust laws were designed to
prevent. . . .  It must prove more than a
violation of § 2(a), since such proof
establishes only that injury _may_ result.

(Citations omitted.)  <u>See also</u> <u>J.F. Feeser, Inc. v. Serv-A-</u>

<u>Portion, Inc.</u>, 909 F.2d 1524, 1531 (3d Cir. 1990) ("To recover

treble damages a plaintiff must prove more than a violation of

section 2(a); it must show the extent of actual injury

attributable to the harm to competition."), <u>cert. denied</u>, 499

U.S. 921 (1991); <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756

F.2d 1467, 1479 (10th Cir.), <u>cert. denied</u>, 474 U.S. 823 (1985)

(same); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS, chp. IV, § K

(2d ed. 1984) [hereinafter ANTITRUST LAW DEVELOPMENTS (SECOND)]

(same).

Accordingly, the court concludes that consideration of the

<u>Sullivan</u> factors is the appropriate method for determining

whether Lago has the requisite antitrust standing to seek damages

under § 4 of the Clayton Act and turns its attention to that

task.


<u>c.  Causal Connection and Directness of Injury</u>

31

The first factor the court must consider is whether there is a causal connection between the alleged antitrust violation--price and allowances discrimination by Hood in violation of the Robinson-Patman Act--and the harm suffered by Lago. Related to this first factor is the fourth Sullivan factor, which requires the court to consider the directness with which the alleged antitrust violation caused the asserted injury.

"By its nature, 'an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy.'" Donovan, supra, ___ F. Supp. at ___, 1994 WL 790887, at *5 (quoting McCready, supra, 457 U.S. at 476-77). "However, because not 'every person tangentially affected by an antitrust violation' is entitled to maintain a claim under the Clayton Act, courts examine the causal connection between the alleged violation and harm and also the directness with which the alleged market restraint caused the asserted injury." Id. (quoting McCready, supra, 457 U.S. at 477).

Lago has submitted evidence which shows that Hood was selling certain Hood products to its direct-buy retailers at lower prices than it was selling those same products to Lago for

32

resale to Lago's retail customers.  See Affidavit of Frances M. Nugent ¶¶ 6-7 (Lago Exhibit B) and documents attached thereto.[8]

As a result of this alleged price discrimination, Lago contends that its customers, small retail grocery stores characterized by Lago as "mom and pop stores", were unable to compete with Hood's direct-buy retailers for the sale of Hood products.  In support thereof, Lago submits the affidavits from three of its retail stores that competed with Hood's direct-buy retailers for the sale of Hood products.  One such Lago customer, Henry M. Cavaretti of Foyes Corner Market in Rye, New Hampshire, states,

> 5.  The retail chain stores consistently sold their Hood milk, cream, O.J. and other products for a price that was less than the price that I was charged by Lago & Sons Dairy, Inc. for those same products.
> 6.  My customers often told me that they believed that I was overcharging them by charging them higher prices for the same Hood products sold by those chain stores at a much lower price.
> 7.  Because I could not compete with the prices charged by the retail chain stores in my area and because Lago could not offer me lower prices with which I could compete with the chain stores, I was forced to stop purchasing dairy products from Lago and began

_____

[8]The court notes that the Affidavit of Josephine R. Raczkowski (Hood's Reply Exhibit B) reveals that some of Nugent's price comparisons are incorrect and further demonstrates that Lago received lower prices than Hood's direct-buy retailers on some Hood products during the time period in question.

33

> to purchase milk, cream, O.J. and other products from Weeks Dairy, Concord, New Hampshire.
>
> 8. The reason that I stopped purchasing Hood milk, cream, O.J. and other products from Lago was because I lost business as a result of the prices charged by the retail chain stores in my area.

Affidavit of Henry M. Cavaretti ¶¶ 5-8 (Lago Exhibit C). For the same reasons detailed in Cavaretti's affidavit, Philip Smith of Bayberry Variety in Kingston, New Hampshire, states that he "was forced to stop purchasing dairy products from Lago and began to purchase milk and other products from Idlenot and Gaelic [sic] Farms." Affidavit of Philip Smith ¶ 7 (Lago Exhibit E).

The third affidavit submitted by Lago is that of Robert A. Mastin of L&M Variety Store in Newmarket, New Hampshire. Mastin states that

> 7. Because I could not compete with the prices charged by the retail chain stores in my area and because Lago could not offer me lower prices with which I could compete with the chain stores, it was difficult for me to compete for those same customers for those Hood products.
>
> 8. We stayed with Lago because of our long time relationship--when they brought in Weeks products the pricing was a lot more competitive.

Affidavit of Robert A. Mastin ¶¶ 7-8 (Lago Exhibit D).

Lago maintains that it suffered lost sales and profits when its retailers, such as Foyes Corner Market and Bayberry Variety,

34

stopped buying Hood products from Lago and instead began buying their dairy products from other dairies. The court finds that the evidence presented is sufficient to demonstrate that there is a causal connection between the Hood's alleged antitrust violation and the harm suffered by Lago.[9] There remains, however, the question of whether that causal connection is direct enough to give Lago antitrust standing in this action.

In order to determine whether Lago's injuries are "too remote" from Hood's antitrust violation to give Lago standing to sue for damages under § 4, the court is required to apply the

[9]In so finding, the court has considered Hood's well-argued contention that there are numerous factors which could have rendered Lago's retailers unable to compete with Hood's direct-buy retailers for the sale of Hood dairy products. However, it is not necessary for Lago to prove that Hood's antitrust violation is the sole cause of its injury. Instead, as the Supreme Court stated in Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969), "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." See also Sullivan v. National Football League, 34 F.3d 1091, 1103 (1st Cir. 1994) ("'Plaintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause.'" (quoting Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 13 (1st Cir. 1979), cert. denied, 446 U.S. 983 (1980))), cert. denied, 115 S. Ct. 1252 (1995). Further, where there is evidence "that the decline in plaintiff's profits . . . was not caused by an antitrust violation and instead resulted from other factors, . . . resolution of the issue ordinarily is for the trier of fact." ANTITRUST LAW DEVELOPMENTS (SECOND), chp. VII, § C.1, at 408.

"elusive" concept of "proximate cause". <u>McCready</u>, <u>supra</u>, 457 U.S. at 477. This analysis requires the court to

> look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

<u>Id.</u> at 478. Further, the First Circuit has recently stated,

> In considering the directness, courts are concerned with the question of which among the affected parties are most likely to be motivated to pursue an antitrust action. While in the usual case, this would be those most directly affected by the antitrust violation, in some cases, more remote parties might be more likely to detect and pursue an antitrust action.

<u>Sullivan</u>, <u>supra</u>, 25 F.3d at 51 n.12.

Lago, as a supplier of Hood dairy products to the retail market, is clearly not the most immediate victim of Hood's alleged discriminatory price and allowance practices. Instead, the retail stores which purchased Hood products from Lago and were consequently unable to compete with Hood's direct-buy retailers for the sale of Hood dairy products to consumers are the direct victims of Hood's alleged discriminatory conduct. <u>See</u>, <u>e.g.</u>, <u>SAS of Puerto Rico</u>, <u>supra</u>, 48 F.3d at 44 (when a supplier "suffers because an antitrust violation curtails a

36

business that would otherwise have purchased from the supplier . . . the failed business is the immediate victim and the preferred plaintiff") (citing II P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶ 375 (rev. ed. 1995) [hereinafter AREEDA & HOVENKAMP]).

"The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to bring an action under § 4.  Associated Gen. Contractors, supra, 459 U.S. at 542.  On the other hand, justification for conferring standing on a "second-best plaintiff" such as Lago may exist when there is "no first best with the incentive or ability to sue."  SAS of Puerto Rico, supra, 48 F.3d at 45.

Hood asserts that the retail stores that Lago supplied are the most appropriate parties to bring claims against Hood for injuring competition at the retail level.  Lago counters that these retail stores do not have the incentive or ability to sue Hood for antitrust violations.  Lago points out that Hood dairy products are just some of the many products these stores carry and that the volume of Hood dairy product sales on a per store basis is often small.  Lago further asserts that the expense of pursuing a § 4 claim against Hood "would far exceed the actual injury sustained by an individual grocery store owner."  Lago's

Opposition Memorandum at 38. The court finds this reasoning to be persuasive and concludes that although Lago is not the party most directly affected by the alleged antitrust violation, it is in a better position to pursue an antitrust action against Hood than its retail store customers.

The court further finds that the physical and economic nexus between the alleged antitrust violation by Hood and the alleged injury to Lago is a close one. It is certainly foreseeable that Lago would lose sales and profits if its retailers were unable to compete with Hood's direct-buy retailers for the sale of Hood products. In addition, as set forth infra at 38-44, the alleged injury suffered by Lago is an "antitrust injury". Under these circumstances, the court finds the causal connection between Hood's alleged antitrust violation and Lago's asserted injury is close enough to confer standing on Lago in this action.

### d. Antitrust Injury

To recover damages under § 4 of the Clayton Act, a private plaintiff "must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (quoting Brunswick, supra, 429 U.S. at 489)

38

(emphasis in Brunswick). Further, "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anticompetitive aspect of the practice under scrutiny, 'since "[i]t is inimical to [the antitrust] laws to award damages" for losses stemming from continued competition.'" Id. (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109-10 (1986) (quoting Brunswick, supra, 429 U.S. at 488)). Otherwise stated, the alleged injury must be "of the type that the antitrust statute was intended to forestall." Associated Gen. Contractors, supra, 459 U.S. at 540 (citing Brunswick, supra, 429 U.S. at 487-88).

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

Atlantic Richfield, supra, 495 U.S. at 343-44.

The antitrust statute allegedly violated by Hood in this case is the Robinson-Patman Act, which "was passed in response to the problem perceived in the increased market power and coercive practices of chainstores and other big buyers that threatened the

existence of small independent retailers." Great Atlantic & Pacific Tea Co. v. Fed. Trade Comm'n, 440 U.S. 69, 75-76 (1979). See also Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 133 n.25 (1978) ("the political and economic stimulus for the Robinson-Patman Act was the perceived need to protect independent retail stores from 'chain stores'").

Lago contends that it was injured as a result of the inability of its retail customers (i.e., small independent retailers) to compete with Hood's direct-buy retailers (i.e., chain stores) for the sale of Hood dairy products to the ultimate consumers of those products. Lago contends that its retail store customers were forced to stop buying Hood products from Lago and began purchasing their dairy products from other dairies and, as a result thereof, Lago suffered lost sales and profits.

The First Circuit recognizes the general rule that a supplier "who suffers because an antitrust violation curtails a business that would otherwise have purchased from the supplier . . . is held not to have suffered 'antitrust injury' . . . ." SAS of Puerto Rico, supra, 48 F.3d at 44 (citing AREEDA & HOVENKAMP ¶ 375). The circumstances which form the basis of Lago's present claims fall squarely within the parameters of this general rule: Lago claims to have been injured because Hood's purported antitrust violation curtailed retail businesses that would

40

otherwise have purchased Hood products from Lago.  In other words, Hood's "conduct was deemed an antitrust violation because of the threat to the customer, not the supplier."  Id.

Even though Lago was not the direct victim of Hood's antitrust violation, under a broad interpretation of the antitrust caselaw, Lago may still "establish antitrust injury by proof . . . that his injury was 'inextricably intertwined' with the injury to competition, in that the plaintiff was '"manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographic market."'"  Sullivan, supra, 25 F.3d at 49 (quoting Providence v. Cleveland Press Pub. Co., 787 F.2d 1047, 1052 (6th Cir. 1986) (quoting Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1086 (6th Cir. 1983))).  See also Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 745-46 (9th Cir. 1984); Ashmore v. Northeast Petroleum Division, 843 F. Supp. 759, 769-70 (D. Me. 1994); Donahue v. Pendleton Woolen Mills, Inc., 633 F. Supp. 1423, 1435-39 (S.D.N.Y. 1986).[10]

---

[10]The court notes that other courts "have interpreted Supreme Court caselaw and the antitrust laws more narrowly, holding that a plaintiff must be a market participant in order to establish antitrust injury."  Sullivan, supra, 25 F.3d at 49 (citing cases).  Although the First Circuit has not yet decided which of these interpretations apply in this circuit, this court finds the reasoning employed by the courts following the broader rule to be persuasive and applies that rule herein.  Those courts

In order to effectuate a price discrimination scheme which favored Hood's direct-buy retailers over retailers that purchased Hood products through Lago, Hood necessarily had to use Lago as a conduit through which to pass its discriminatory pricing onto Lago's smaller retailers. However, even under such circumstances, Lago does not suffer an "antitrust injury" unless its losses "stem[] from a competition-<u>reducing</u> aspect or effect of [Hood's] behavior." <u>Atlantic Richfield</u>, <u>supra</u>, 495 U.S. at 344.

The profits Lago seeks to recover in this action were lost because Lago's retail store customers stopped purchasing Hood dairy products from Lago and began purchasing dairy products from other dairies such as Idlenot and Garelick Farms. <u>See</u>, <u>e.g.</u>, Affidavit of Philip Smith ¶ 7 (discussed <u>supra</u> at 34). Hood contends that Lago has not suffered an antitrust injury because

reason that the injury suffered by a plaintiff used as a means to effect an antitrust violation is within the core of Congressional concern underlying the antitrust laws, which is "'to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions and would provide ample compensation to the victims of antitrust violations.'"

<u>Sullivan</u>, <u>supra</u>, 25 F.3d at 49 n.11 (quoting <u>Ashmore</u>, <u>supra</u>, 843 F. Supp. at 770 (quoting <u>McCready</u>, <u>supra</u>, 457 U.S. at 472); <u>see also</u> <u>Ostrofe</u>, <u>supra</u>, 740 F.2d at 746-47).

42

Lago's losses are "likely to have resulted from its customers switching to one or more of Hood's competitors--_i.e._, as a result of competition, not the lack of it . . . ." Hood's Motion at 25. Hood's argument, although appealing, relies on an expanded definition of the market in which Lago alleges that competition has been injured.

Lago defines the market in which competition was injured due to Hood's antitrust violation as the retail market for <u>Hood</u> dairy products. Hood's argument that there has been no antitrust injury relies, at least in part, on an expansion of that market to encompass the retail sale of all brands of dairy products. If the market is so defined, then, as Hood contends, there is indeed no antitrust injury as the result of the decision of Lago customers to stop purchasing Hood dairy products in favor of other brands of dairy products. Instead, Lago's losses would clearly stem from competition between various suppliers of dairy products and therefore would not constitute an "antitrust injury."

However, Lago's narrow definition of the affected market appears to the court to be proper under cases such as <u>Fed. Trade Comm'n v. Morton Salt Co.</u>, 334 U.S. 37 (1948), where the market allegedly affected by price discrimination was the sale of Morton's "Blue Label" table salt at the retail level. <u>See</u>

43

Morton, supra, 334 U.S. at 49 ("Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store."). Accepting Lago's narrow definition of the affected market, which the court does at this time, the court finds that the effect of Hood's purported price discrimination was to reduce competition for the sale of Hood dairy products at the retail level between large direct-buy retailers and smaller independent retailers purchasing through Lago. This is precisely the type of problem that the Robinson-Patman Act was designed to address. Further, Lago's injuries stem from the "competition-reducing aspect or effect of [Hood's] behavior." Atlantic-Richfield, supra, 495 U.S. at 344. In other words, even though Lago was not a consumer or competitor in the relevant market, the injury Lago suffered was "inextricably intertwined" with the injury to competition caused by Hood's alleged price discrimination. Sullivan, supra, 25 F.3d at 49. Under these circumstances, the court finds that Lago has suffered an "antitrust injury."

The "existence of antitrust injury is a central factor in the standing calculus." Sullivan, supra, 25 F.3d at 47.

44

Accordingly, the presence of antitrust injury here weighs heavily in favor of conferring antitrust standing on Lago.

    e.  Damages

The fifth and sixth <u>Sullivan</u> factors require the court to consider the speculative nature of Lago's damages and the risk of duplicative recovery or complex apportionment of damages.

"Damages may be considered speculative where the plaintiff's injury was indirect and possibly the result of intervening factors unrelated to the defendant's conduct." <u>Donovan</u>, <u>supra</u>, ___ F. Supp. at ___, 1994 WL 790887, at *5 (citing <u>Associated Gen. Contractors</u>, <u>supra</u>, 459 U.S. at 540-42). That being said, the court notes that damage issues in antitrust cases "'are rarely "'susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'" <u>J. Truett Payne</u>, <u>supra</u>, 451 U.S. at 565 (quoting <u>Zenith</u>, <u>supra</u> note 9, 395 U.S. at 123-24 (quoting <u>Bigelow v. RKO Pictures, Inc.</u>, 327 U.S. 251, 264 (1946))). Acknowledging this problem, the Supreme Court

> "has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits, and values, not shown to be attributable to other

45

> causes, that defendants' wrongful acts had
> caused damage to the plaintiffs.'"

Id. (quoting Zenith, supra note 9, 395 U.S. at 123-24) (quoting

Bigelow, supra, 327 U.S. at 264)).

The damages Lago claims to have suffered are the lost profits from "customers lost by Lago because of competition due to price during the four year period at issue in the price discrimination claims, April 1988 through March 1992." Affidavit of Paul R. Gallant ¶ 6 (Lago Exhibit F). In other words, Lago does not seek lost profits from the inability of its retailers to compete with Hood's direct-buy retailers for the sale of Hood products during the time when Lago was selling Hood products to such retailers. Instead, Lago seeks lost profits from the sales it lost after certain retail customers stopped purchasing Hood dairy products from Lago and began purchasing dairy products from other dairies because Lago's prices on Hood products were too high.[11] Lago's calculation of these lost profits is detailed in Paul Gallant's affidavit as follows:

> 6. I analyzed the lost income and profits
> in the following manner.
> a. I consulted the customer list produced
> by Lago and identified as Robert Lago
> Deposition, Plaintiff's Exhibit No. 8
> (hereinafter "customer list"). The customer

---

[11]Lago's damages are, however, limited to the time period during which Lago was a distributor of Hood dairy products.

46

list provides a list of all customers lost by Lago because of competition due to price during the four year period at issue in the price discrimination claims, April 1988 through March 1992.

b. I then added the total actual sales for all customers that Lago lost during April 1988 through March 1992 as a result of competition with the favored large retail chains.

c. I then multiplied the Actual Account sales Lost by the number of years that Lago lost that business during April 1988 through March 1992.

d. I then determined the total lost sales for each year which was $394,584.00, $212,669.00, $613,587.00, and $37,929.00 respectively. I then added all four years together for a total actual lost sales of $3,481,446.00.

e. I then multiplied the total actual lost sales for all four years ($3,481,446.00) by the average gross profit that the Lago's realized on their retail business to their customers, namely 24%.

f. I then arrived at the total gross profit lost due to price competition or $835,547.00.

g. The $835,547.00 does not include any trebling of damages or attorneys fees which the Lago's may be entitled to under the price discrimination statute.

Gallant Affidavit ¶ 6.

Hood's initial challenge to Lago's damage claim is that said claim is in fact much broader than it has been characterized by Lago here. Hood points out that the lost customer list attached to Paul Gallant's affidavit includes schools and restaurants and argues that Lago cannot recover lost profits from the sales lost

47

from such customers because they were not in competition with Hood's direct-buy retailers. Hood also points out that Lago's lost customer list includes Lago customers that went out of business. Hood argues that Lago cannot recover the profits it lost after said customers stopped purchasing Hood products from Lago because there is no evidence that the closure of those businesses was caused by Hood's alleged price discrimination.

The court agrees with Hood on these two points and holds that Lago cannot recover under Counts IX and X profits lost from schools and restaurants or from retail store customers that went out of business. However, the court finds that Lago, in its lost profits analysis for Counts IX and X, has correctly narrowed its damages claim to include only the retail store customers it lost to competitors because of price. It is this measure of damages that the court will consider in evaluating whether Lago has the requisite antitrust standing to pursue Counts IX and X.

As set forth <u>supra</u> at 31-38, Lago's damages are only indirectly related to the impact Hood's alleged price discrimination had on competition between Hood's direct-buy retailers and Lago's retail store customers. Further, as Hood argues, there are several possible "intervening factors unrelated to defendant's conduct," <u>Donovan</u>, <u>supra</u>, ___ F. Supp. at ___, 1994 WL 970887, at *5, that may have caused Lago's losses. Such

48

factors include Lago's own markups on the Hood products it resold to retailers.

Moreover, Lago's lost profits analysis assumes that Lago would have continued to sell Hood products to the customers it lost between 1988 and 1992 but for Hood's price discrimination. As Lago's lost customer list reveals, Lago lost a large number of customers during the relevant time period because those customers went out of business.

The court finds Lago's lost profits analysis to be somewhat speculative in light of the fact that Lago's "injury was indirect and possibly the result of intervening factors unrelated to defendant's conduct." Donovan, supra, ___ F. Supp. at ___, 1994 WL 790887, at *5. This factor weighs against conferring antitrust standing on Lago.[12]

Finally, because Lago has limited its damages to lost profits, the court finds the risk of duplicative recovery to be negligible. See, e.g., Morris Elecs., Inc. v. Mattel, Inc., 595 F. Supp. 56, 60-61 (N.D.N.Y. 1984) (duplicative recovery is minimal when plaintiff's injuries are limited to its lost

_____

[12]The court further notes that Lago's lost profits analysis results in a lost gross profits figure. The correct measure of damages, which is the measure Lago must prove at trial, is lost net profits. See, e.g., Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927).

profits). Furthermore, "in the absence of an action by a party claiming a more direct antitrust injury . . . there is little risk of duplicative recovery." Donovan, supra, ___ F. Supp. at ___, 1994 WL 790887, at *7. There has been no antitrust action filed by the direct victims of Hood's alleged antitrust violation--Lago's retail store customers. Consequently, there is also no complex apportionment of damages required in this action. These factors favor conferring antitrust standing on Lago.

### f. Improper Motive

To the extent that the improper motive factor listed in Sullivan applies to the instant action, the court finds that the evidence showing that Hood was charging Lago higher prices for certain Hood products than it was charging to its direct-buy retailers is sufficient to support an inference of an improper motive. Accordingly, this factor weighs, if at all, in favor of conferring standing on Lago.

### g. Balancing the Factors

Although Lago's damages appear at this stage to be rather speculative, the remaining factors, including the existence of an "antitrust injury," weigh in favor of conferring standing on Lago to pursue its § 4 claims. Hood's motion for summary judgment as

50

to Counts IX and X, which was limited to the standing issue, is accordingly denied.[13]

5. Hood's Motion for Reconsideration of Award of Interest

In its order of September 6, 1994, the court granted Hood's motion for partial summary judgment on Hood's counterclaim for breach of contract as to the $214,248.45 due from Lago to Hood for the time period from December 1991 to March 1992. However, the court denied Hood's motion insofar as it sought interest on the amount due because the court found that a genuine issue of material fact remained as to the date from which the interest should begin to accrue. See Order of Sept. 6, 1994, at 32-33.

Hood now moves for reconsideration of the court's determination on the matter of interest, arguing that the issue is one of law, not of fact. Lago objects to Hood's motion, arguing that the question of when interest should begin to accrue is one of fact.

---

[13]The court notes that the antitrust standing hurdle is only the first of several hurdles Lago must clear to recover treble damages under § 4 of the Clayton Act. At trial, Lago will be required to prove that Hood violated the Robinson-Patman Act in the manner alleged and that Lago suffered an actual injury attributable to said violation. J. Truett Payne, supra, 451 U.S. at 562. Lago must also submit sufficient evidence "to support a 'just and reasonable inference' of damage." Id. at 566.

Hood is entitled to interest at a rate of 10 percent on the $214,248.45 due from Lago as a matter of law.  <u>See</u> RSA 335:1 (1984) ("The annual rate of interest on judgments and in all business transactions in which interest is paid or secured, unless otherwise agreed upon in writing, shall equal 10 percent.").  The question of when that interest begins to accrue is governed by RSA 524:1-a, which provides in pertinent part,

> **Interest to be Added.**  In the absence of a demand prior to the institution of suit, in any action on a debt or account stated or where liquidated damages are sought, interest shall commence to run from the time of the institution of suit.

RSA 524:1-a (1974).

It is undisputed that under RSA 524:1-a, interest shall accrue from the earlier of either the demand for payment or the institution of suit.  However, the court finds, as it did in its order of September 6, 1994, that there is a genuine dispute in this case as to the date when Hood made its demand(s) for payment.  This dispute is a factual one and precludes the court from determining as a matter of law the date from which interest shall accrue in this action.  Defendant's motion for reconsideration is accordingly denied.

## Conclusion

For the reasons set forth herein, Hood's Renewed Motion for Summary Judgment on Count V and Part of Count VIII (document 100) is denied; Hood's Motion for Partial Summary Judgment on Counts I and II of its Counterclaims (document 82) is denied; Hood's Motion for Summary Judgment on Counts IX and X (document 101) is denied; and Hood's Motion for Reconsideration of Award of Interest (document 80) is denied.

In light of these rulings, discovery in this action is herewith extended for a six-month period and shall close on December 22, 1995.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

June 20, 1995

cc:   Charles J. Dunn, Esq.
      John V. Dwyer, Esq.
      Philip D. O'Neill, Jr., Esq.
      James F. Ogorchock, Esq.
      Frank P. Spinella, Jr., Esq.